1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF ALASKA

3
    RICHARD F. REZNAK,                    )
4                                         )
                        Plaintiff,        )
5                                         )
    vs.                                   )
6                                         )
    DONALD H. RUMSFELD,                   )
7                                         )
                        Defendant.        )
8   _____)
    Case No. 4:05-cv-7-RRB
9
                 DEPOSITION OF RICHARD REZNAK
10                    February 16, 2006

11  APPEARANCES:

12        FOR THE PLAINTIFF:         MR. RICHARD REZNAK
                                     In propria persona
13                                   P.O. Box 55129
                                     North Pole, AK 99705
14                                   (907) 490-9064

15        FOR THE DEFENDANT:         MR. DANIEL R. COOPER, JR.
                                     Assistant U. S. Attorney
16                                   U. S. Department of Justice
                                     U. S. Attorney's Office
17                                   22 West Seventh Avenue, #9
                                        Room 253
18                                   Anchorage, Alaska 99513
                                     (907) 271-5071
19
                          *  *  *  *
20

21

22

23

24

25

1    PURSUANT TO NOTICE, the Deposition of Richard Reznak

2  was taken on behalf of defendant before Marci Lynch, Notary

3  Public in and for the State of Alaska, and Reporter for Liz

4  D'Amour & Associates, Inc., at the offices of Liz D'Amour &

5  Associates, 330 Wendell Street, Fairbanks, Alaska, on the 16th

6  day of February, 2006, commencing at the hour of 11:05 o'clock

7  a.m.

8                         **TABLE OF CONTENTS**

9         Direct Examination by Mr. Cooper  . . . . . . . . . . 3

10        **EXHIBITS:**

11        # 1   Plaintiff's Complaint  . . . . . . . . . . . . . 6
          # 2   4/13/01 Letter - Notice of Demotion  . . . . . 34
12        # 3   EEO Complaint against Sutherland . . . . . . . 24
          # 4   Early Retirement Calculation Sheet . . . . . . 46
13        # 5   HR Transaction Record, RIF, 4/30/01  . . . . . 46
          # 6   E-mails regarding RIF Roster . . . . . . . . . 46
14        # 7   RIF Procedures, 3-88 . . . . . . . . . . . . . 46
          # 8   RIF Procedures, 4-14 . . . . . . . . . . . . . 46
15        # 9   Correspondence with Richard Wright . . . . . . 74
          #10   Miscellaneous Correspondence . . . . . . . . . 74

16                          * * * *

17

18

19

20

21

22

23

24

25

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

1                    **P R O C E E D I N G S**

2                    (On record)

3                    COURT REPORTER:  We're on record.  My name is

4    Marci Lynch with Liz D'Amour & Associates in Fairbanks, Alaska.

5    Today's date is February 16th, 2006.  The time is 11:05 a.m.

6    We are here in the case of Richard Reznak versus Donald

7    Rumsfeld, case number 4:05-cv-7-RRB.  We are meeting for the

8    deposition of Mr. Richard Reznak.  Will counsel please identify

9    himself for the record.

10                    MR. COOPER:  Dan Cooper for the United States.

11   I'm the one that noticed the deposition.

12                    MR. REZNAK:  Richard Reznak, the plaintiff.

13                    COURT REPORTER:  Okay.  Sir, would you please

14   raise your right hand?

15                    MR. REZNAK:  Sure.

16                    (Oath administered)

17                    MR. REZNAK:  Yes, I do.

18                    COURT REPORTER:  Thank you.

19                         RICHARD REZNAK

20   having first been duly sworn under Oath, testified as follows

21   on examination:

22                    COURT REPORTER:  For the record, please state

23   your full name and spell your last name.

24   A       Richard Francis Reznak, R-e-z-n-a-k.

25                    COURT REPORTER:  Thank you.  Your mailing

```
 1   Q    Okay.  Now, when you came to Fort Wainwright, could you
 2        just describe that facility itself for me?
 3   A    Oh, yeah.  I was actually pretty shocked.  They had the
 4        automation, the equipment.  It was there back in the
 5        stock room.  It seemed like Alaska was just -- just a
 6        forgotten area when it came to, you know, the
 7        technology and advancements, so I liked the challenge
 8        because I knew how to do -- work with this equipment,
 9        and right away I got this stuff un- -- uncrated and
10        installed and started training employees and cleaning
11        up and.....
12   Q    So would it be fair to say, it was kind of a mess?
13   A    It was a mess.  Yes, it was.  Yeah.
14   Q    All right.  And what year was that when you came to
15        Eielson -- or, excuse me, to Wainwright?
16   A    That's '94.
17   Q    1994.
18   A    Yeah.
19   Q    Now, when were you asked to take over the Eielson
20        facility?
21   A    Eielson, I knew -- Mr. Holland, my general manager over
22        in Europe.  He knew my reputation of being -- cleaning
23        up and -- it must have been like about four or five
24        months after he saw -- he says, Richard, you can do
25        much more than this, you know.  I know what you're
```

1          capable of and we can get you promoted and -- it was

2          just months.  It was with -- within a year I had both

3          stores, you know.

4   Q      Okay.  So that would have been '94, '95?

5   A      Yeah.  I'm saying yes to you.  That was a while ago,

6          but, yeah, '94, '95.

7   Q      Okay.

8   A      Yeah.

9   Q      No later than the end of '95 you had.....

10  A      I -- I had control, yeah.  I.....

11  Q      Okay.  How -- what was the number of stores or

12         facilities that you had under your control, then, at

13         the end of '95?

14  A      I had two -- two -- two full service auto care centers,

15         yeah.

16  Q      All right.  Now, you mentioned that you got a new

17         general manager that came on.....

18  A      Right.

19  Q      .....that did things differently than Mr. Holland, is

20         that what you said?

21  A      Right, right, right.

22  Q      Okay.  What was the new general manager's name?

23  A      His name is Mr. Raher, R-a-h-e-r.

24  Q      R-a-h-e-r.

25  A      Yeah.

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

| | | |
|---|---|---|
| 1 | Q | Okay.  When did he come on board? |
| 2 | A | Oh.  When Mr. Holland retired. |
| 3 | Q | Yeah. |
| 4 | A | I think it was '95.  I -- I can tell you exactly |
| 5 | | because I have records.  May I look?  Yeah, you don't |
| 6 | | mind. |
| 7 | Q | Sure. |
| 8 | A | If I can see when he wrote my first evaluation, I can |
| 9 | | tell you.  Let's see.  Hold on a second.  Let's see. |
| 10 | | Let's see.  I have it somewhere else, excuse me.  Yeah, |
| 11 | | it must have been '95, because here is my second |
| 12 | | evaluation from Mr. Raher and he -- and he wrote one |
| 13 | | '95 to '96, so it was '95. |
| 14 | Q | Okay. |
| 15 | A | Probably in the fall of '95. |
| 16 | Q | So Mr. Raher -- and I apologize for mispronouncing his |
| 17 | | name.  It's spelled R..... |
| 18 | A | Raher, Raher, Raher. |
| 19 | Q | R-a-h-e-r, though, right? |
| 20 | A | Right, right. |
| 21 | Q | Okay.  Did he come before or after you'd been -- you'd |
| 22 | | taken over the -- Eielson? |
| 23 | A | After. |
| 24 | Q | Okay.  Now, after you took over the Eielson store, did |
| 25 | | you take over any other facilities?  Were you ever |

```
 1              position.  I had achieved my goal; I had made the
 2              sales; and I wasn't promoted.  They had a moratorium on
 3              promoting people.  And they could get exception to that
 4              if -- if -- if the general manager would write and ask
 5              for an exception, but no one wrote for an exception, so
 6              I wasn't -- I was -- I promoted myself and I didn't
 7              receive my promotion for a year.  And I wasn't happy
 8              about that either.
 9    Q        No.  I imagine not.  When did you actually start
10              receiving pay as a GS-12, do you recall?
11    A        God, I got to look at that record.
12    Q        No, I mean, just roughly.  I mean, I'm not going
13              to.....
14    A        I -- I would say.....
15    Q        It's like '96, '97?
16    A        Yeah, probably '96, yeah, '97.  That -- that sounds
17              fair to me.
18    Q        Okay.  Now, so you were -- you had these two
19              facilities?
20    A        Right.
21    Q        You had some other offers that you'd turned down?
22    A        Sure, sure.
23    Q        And how was generally your relationship with Mr. Raher?
24    A        Raher came on board -- it was in the fall.  I was
25              coming back from a hunting trip.  I came back early to
```

1    meet him at one of my -- one of my stores.  And he was

2    super friendly -- hi, Rick, kind of -- you know, nice

3    to meet you, do you like to hunt, can I get in on a

4    hunting trip with you and all this.  And then, I

5    thought, great, we have -- we have -- this is going to

6    be a super guy to work with and everything.  And they

7    had another change in upper, upper management.  Mr. Dix

8    came on board.  And at -- in the same time frame, Raher

9    just -- he just went -- he did a 180 on me.  You know,

10   we were -- we were -- I told him -- I told him, you

11   know, some of my thoughts about -- well, what had

12   happened when they gave me both facilities, the

13   criteria, which I was an expert at -- at doing for bo-

14    -- for automotive facilities, called for the --  I was

15   supposed to have an annex manager out at Eielson Air

16   Force base and I was -- what happened, they transferred

17   the other 11, who was a contemporary of mine out of

18   there.  They gave me both facilities and I'm left to

19   manage two full fledged facilities as a GS-11 and I had

20   no annex manager support.  It's 26 miles away.  By

21   criteria and by -- by regulation, I was supposed to

22   have.....

23  Q    Help.

24  A    .....help.  And I -- I -- I asked for help and that

25      started getting me into trouble.  And Mr. Dix, who came

18

1     on board, was one of the -- the real -- the
2     penny-pinching type, you know, management that, even if
3     they're not doing something legal and they're not
4     paying, you know, employees what they should be
5     earning, they just -- that's the kind of style of
6     leadership that they had.  And there was -- that was
7     a -- all this new regime came in.  They're all cronies,
8     these guys, and I like to follow the rule of law and
9     then I -- then I tried to and that got me in some
10    trouble with Raher right there from the jump street,
11    you know.

12 Q  Okay.  What -- can you give me a specific example?

13 A  Yes.  I -- I said that -- yeah, I can show you on my
14    evaluations right here -- I mean, my rebuttals.  He --
15    I told him I needed an annex manager.

16 Q  Right.

17 A  It's too far away and these people are only like hourly
18    paid.  They're called pump island foremans [sic].  They
19    don't even have the -- by -- by job description, they
20    don't even have the authority to do the things, locking
21    the facility and do the things that they're -- they're
22    doing, you know.  And I tried.....

23 Q  Right.

24 A  I tried to get my staffing in order as part of
25    management -- being a good manager.

19

| | | |
|---|---|---|
| 1 | Q | Well, let me stop you there for just a second, make |
| 2 | | sure I understand. |
| 3 | A | Sure. |
| 4 | Q | Instead of having an annex manager out at Eielson, all |
| 5 | | you had were pump island foremen, so..... |
| 6 | A | Formans [sic], no management. |
| 7 | Q | That's what I'm -- let me start over.  Okay.  Now, |
| 8 | | listen to what I'm saying.  Okay. |
| 9 | A | I'm listening. |
| 10 | Q | Instead of having an annex manager out at Eielson, you |
| 11 | | only had pump island foremen, correct? |
| 12 | A | Correct. |
| 13 | Q | And so pump island foremen were being asked to perform |
| 14 | | some of duties that would be normally performed by |
| 15 | | either yourself or an annex manager, right? |
| 16 | A | Right. |
| 17 | Q | And you found that to be against the regulations and |
| 18 | | you brought that to your supervisor's attention? |
| 19 | A | Right. |
| 20 | Q | Okay. |
| 21 | A | Right. |
| 22 | Q | So that -- that's one form of, I guess for lack of a |
| 23 | | better word, contention between yourself and Mr. Raher |
| 24 | | and Mr. Dix and management.  Were there other issues of |
| 25 | | conflict between yourself and management? |

1    A    There was on -- some on equipment.  We needed

2         equipment.  It was inferior.  It violated OSHA and

3         standards and whatever and -- unsafe.  Lifts didn't

4         have, you know, safety catches and whatever and I -- I

5         wanted to upgrade.  And I also made a suggestion back

6         there to -- to innovate.  Our pumps were all

7         depreciated and that was the -- technology was going to

8         the credit card, so I suggested that and ever since the

9         personnel staffing thing started, anything I would

10        suggest was just -- I just hit a wall.  I just -- I --

11        I -- I was in -- I got in trouble for.

12   Q    Right.

13   A    I can show you in writing, too.

14   Q    Let me just make sure I understand.

15   A    Sure.  Uh-huh.

16   Q    You made the request for personnel staffing and that

17        was denied.  And then every other suggestion you made

18        about improving efficiency, improving sales, improving

19        anything with the store was pretty much rejected out of

20        hand?

21   A    Right, right, right.

22   Q    Okay.  All right.  Now, did there come a time when you

23        were working for AAFES that you filed a complaint, an

24        EEO complaint?

25   A    I did.

1   Q      And that was against whom?

2   A      That was against a -- an accounting clerk or

3          supervisor, Sharon Sutherland.

4   Q      All right.

5   A      Yeah.

6   Q      And that complaint has been resolved?

7   A      Well, it wasn't resolved.  It was kind of -- the

8          cronyism thing.

9   Q      Well, let me rephrase that.

10  A      Sure.

11  Q      It's no longer active, right?

12  A      It's not active anymore, no.

13  Q      Okay.  And that complaint against Ms. Suth-.....

14  A      Suth- -- Sutherland.

15  Q      .....Sutherland has nothing whatsoever to do with this

16         complaint that we have here, exhibit 1, right?

17  A      Indirectly.

18  Q      Okay.  How does it relate indirectly?

19  A      Well, I think later on, Mrs. Esposito, who I mentioned

20         in my complaint, she was a really good friend of

21         Sutherland and -- and she was harboring some prejudice

22         against me and.....

23  Q      When you say she.....

24  A      Esposito.

25  Q      Esposito.

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

| 1 | A | Yeah, later on, she's -- administered my retirement |
| 2 | | later on. |
| 3 | Q | Okay. |
| 4 | A | Yeah. |
| 5 | Q | So you think that there's some -- there's a |
| 6 | | connection between Sutherland and Esposito and that |
| 7 | | Esposito treated you unfairly at least in part, because |
| 8 | | you brought the complaint against Ms. Sutherland? |
| 9 | A | Well, and also -- yeah.  They were not only really best |
| 10 | | friends, but also, she worked directly for Mr. Raher. |
| 11 | Q | Who is she? |
| 12 | A | Esposito. |
| 13 | Q | Okay. |
| 14 | A | And Esposito, she -- she just echoed whatever |
| 15 | | management said and she, as a personnel manager, knew |
| 16 | | that the staffing was incorrect.  And I was -- I was |
| 17 | | kind of in battle with her about doing what was |
| 18 | | ethically right, so she became an enemy.  I mean -- I |
| 19 | | mean..... |
| 20 | Q | Esposito did? |
| 21 | A | Yes, she did. |
| 22 | Q | Okay. |
| 23 | A | She has a motive. |
| 24 | Q | Right. |
| 25 | A | But -- yeah. |

| | | |
|---|---|---|
| 1 | Q | But the only connection between your EEO complaint |
| 2 | | against Sutherland and this complaint is the connection |
| 3 | | of which you've just spoken? |
| 4 | A | They're -- right -- friends and then -- yes. |
| 5 | Q | Right. |
| 6 | A | That -- we'll leave that one alone, because -- I |
| 7 | | mean..... |
| 8 | Q | Yeah.  Well, one of the things I'm trying to do is, you |
| 9 | | know, kind of..... |
| 10 | A | You're doing great. |
| 11 | Q | .....identify the parameters of what we got going on. |
| 12 | A | Mr. Cooper, you're -- you're doing great. |
| 13 | Q | Okay. |
| 14 | A | I'm right with you. |
| 15 | Q | All right.  And what year did that complaint against |
| 16 | | Sutherland take place, do you recall? |
| 17 | A | It came right in the same time frame when Raher came on |
| 18 | | board. |
| 19 | Q | 1990-..... |
| 20 | A | Six. |
| 21 | Q | Didn't he come in 1996?  Did you make the complaint in |
| 22 | | '96 or '97? |
| 23 | A | I think -- I think it was -- I think it was '96, but |
| 24 | | it -- yeah. |
| 25 | Q | Well, here let me..... |

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

```
 1   A      This is a.....

 2   Q      Yeah.

 3   A      Yes.   Okay.

 4   Q      Okay.   It says statement of facts.   Do you see that?

 5   A      Yes.

 6   Q      The first paragraph under that says that you -- well,

 7          it says what it says, but basically, you were employed

 8          by AAFES for 25 years.....

 9   A      Yes.

10   Q      .....and your retail sales profits and performance was

11          considered outstanding, right?   And that's what you've

12          been telling me today, that your sales just went up and

13          up and up.

14   A      Well, based on their opinion, was considered

15          outstanding.

16   Q      Right.

17   A      It was superior in my opinion.

18   Q      Okay.

19   A      But that's just.....

20   Q      Well, let's stop there for a minute.....

21   A      Okay.

22   Q      .....because we want to make sure we use words the

23          right way.

24   A      All right.

25   Q      When we talk about outstanding versus superior, are
```

1      those levels on a performance evaluation form that you

2      receive for your work at AAFES?

3  A   Yes.

4  Q   And which is higher, superior or outstanding?

5  A   Superior.

6  Q   Superior is higher.  Okay.  So AAFES considered you to

7      be outstanding, but you believed that your work was

8      actually superior according to their rules and their

9      regulations.  Is that fair to say?

10 A   Right, with no counseling to support what they were --

11     how they were rating me was based on personality and my

12     involvement in other activities.

13 Q   Okay.  Now, in paragraph 2 in the statement of facts,

14     your -- it starts out, the plaintiff was given an

15     official notice of demotion due to reduction in force

16     on April 13th, 2001.....

17 A   Yeah.

18 Q   .....due to alleged high personnel col- -- costs, et

19     cetera.

20 A   Yeah.

21                        (Deposition Exhibit 2 marked)

22 Q   I'm going to hand you what's been marked for the

23     purpose of your deposition, is exhibit number 2.....

24 A   Yeah.

25 Q   .....ask you take a look at that.

41

1  A    Yes.

2  Q    Was that -- why did you want to get that information?

3  A    Because I like to see how -- you know, I'm making a

4       career decision here.

5  Q    Uh-huh.

6  A    I'm told that I'm being rated against my peers.  I'm

7       offered a penalty-free retirement and I -- and I'm

8       looking at -- I'm evaluating the facts.  And I'm

9       saying, well, that roster is -- I'm at the top of the

10       -- the chain of middle management.  4-2 is as high as

11      you go in this area.  I want to see how I rated.

12      I'm -- I'm curious to see what -- what the scale is.

13 Q    Well, are you just curious or if you'd been at the top

14      of the heap, would you have taken a penalty-free

15      retirement?

16 A    You know, at that point in time, when this reduction-

17      in-force roster came into play, I had asked the

18      area VP, to give a lot on their curtailment 24 program,

19      which is a program where they give you a $25,000 bonus;

20      you farm your job out to -- had -- two 4-2s, one at

21      Wainwright, one at Eielson, they could farm my job out,

22      put Terry in charge of this service station and another

23      manager in charge of that station.  So that's the

24      program I wanted to go -- that this demotion and

25      reduction in force was concocted by Mrs. Esposito.

1    Q    Okay.  Now, let's stop because you've said several

2          things there.

3    A    Sure.

4    Q    You said you had told the area vice president that.....

5    A    I wrote him.

6    Q    Okay.

7    A    I wrote him an e-mail.  I don't have a copy of it.

8    Q    That's fine.  But I want to make sure I understand the

9          sequence of events.  You wrote the area vice

10         president.....

11    A    Mr. Roy Hines.

12    Q    .....that you wanted to -- when you say go out, that

13         means retire?

14    A    Under the curtailment 24 program.

15    Q    Program.  And how would a retirement under the

16         curtailment 24 program differed financially from the

17         retirement that you're currently receiving?

18    A    Well, the way I was reading it, I was going to get a

19         $25,000 bonus and I would be penalized on my

20         retirement, but that would be the offset of -- of the

21         retirement.

22    Q    Okay.  Well, let's stop there for second.

23    A    Yeah.

24    Q    You would have received $25,000 cash upon retirement?

25    A    Right.  I thought I would, yeah.

| | | |
|---|---|---|
| 1 | Q | Right.  Under the curtailment 24 program, but you would |
| 2 | | have received a reduced benefit -- a monthly benefit, |
| 3 | | is that right? |
| 4 | A | Yeah, right. |
| 5 | Q | About how much, do you remember? |
| 6 | A | A couple percent per year under -- I guess -- it was |
| 7 | | a -- they had some kind of factor in there about a -- a |
| 8 | | calculation.  Yeah. |
| 9 | Q | But that was what you wanted to do initially? |
| 10 | A | Right.  I -- I thought if I -- if I got the bonus and |
| 11 | | I -- I would accept the -- the reduction in salary. |
| 12 | Q | Okay.  But instead, ultimately you received this |
| 13 | | advanced notice of demotion due to reduction in force, |
| 14 | | correct? |
| 15 | A | Right.  Esposito says that curtailment 24 wouldn't |
| 16 | | work, but she's -- she came up with this as a -- as a |
| 17 | | means of letting me retire. |
| 18 | Q | But you -- did you want to retire at that time to get |
| 19 | | away from..... |
| 20 | A | Oh.  After -- after -- yes.  After the -- the |
| 21 | | evaluations and the -- and the harassment I'd been |
| 22 | | through and the reprisal, I -- I..... |
| 23 | Q | You just wanted out? |
| 24 | A | I -- right.  And my attorney was working with me.  Rich |
| 25 | | was working with me.  He says -- and when I showed him |

```
 1            the proposal that they gave me and I have copies of
 2            everything.  He says, Richard, you need to go because
 3            it's -- it's really hurting you.  I mean, it's --
 4            it's -- it's not good for you.
 5   Q        It's not good for you to keep working under these
 6            conditions?
 7   A        Under these conditions, no.
 8   Q        So in your view, based upon what you know from the
 9            letter or e-mail that you received from Mrs. Netter on
10            October 10th, 2002.....
11   A        Right.
12   Q        You believe that the statement in paragraph 4 to be
13            totally false?
14   A        Oh, it is totally false.  There's no roster.  Where's
15            the -- where's my retention score?  I mean.....
16   Q        Yeah.  Okay.  But I just -- I need to.....
17   A        Totally false.
18   Q        Paragraph 4 is an untrue statement.
19   A        I bel- -- I believed it when I got this letter and when
20            I found out I was being penalized for my retirement a
21            year later, I said that, well, if I'm being penalized
22            for my retirement, was this RIF even valid.
23   Q        Okay.  A year later.....
24   A        Yes.
25   Q        .....so that would have been in -- when did you find
```

1          RIF procedures for UA employees.....

2   Q      Okay.

3   A      .....overseas and in CONUS.

4   Q      When you say AR 60-21, what does AR stand for?

5   A      It's regulation, army regulations.  It's -- it's

6          personnel regulations governing federal employees.

7   Q      Okay.  That would have been employees of AAFES?

8   A      AAFES or -- yeah.  Federal employees.

9   Q      You know, we never really did start off perhaps

10         properly.  What is AAFES?  Could you spell that and

11         what does it stand for?

12  A      Army and Air Force Exchange Service.

13  Q      Okay.  And that was your employer?

14  A      That was my employer.

15  Q      And you were a civilian employee?

16  A      Civilian, yes, sir.

17  Q      Okay.  Now -- all right.  Now, we got all these pieces

18         of paper out here.  Let's go back and take a look at a

19         couple of them.  Let's take a look at this one right

20         here, which is exhibit number 4.

21  A      Right.

22  Q      This is the calculation of your retirement pay that you

23         were going to receive that was given to you by

24         Ms. Esposito on or about April 16th, 2001, right?

25  A      Right.

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

| | | |
|---|---|---|
| 1 | Q | Now, you say that -- I'm confused. We need to get |
| 2 | | clarified. How did this calculation differ from what |
| 3 | | you actually received in terms of retirement pay? |
| 4 | A | When Mrs. Esposito gave this to me -- when -- when I -- |
| 5 | | during my RIF, she highlighted -- I have the original |
| 6 | | copy -- or she highlighted the basic annuity without |
| 7 | | reductions, because when I was given this retirement, |
| 8 | | Mrs. Esposito specifically opened up with, I have good |
| 9 | | news for you, Mr. Reznak. And her good news was, I'm |
| 10 | | being retired without age penalty. |
| 11 | Q | Basic annuity -- okay. You were being retired without |
| 12 | | an..... |
| 13 | A | Without -- without an age penalty. |
| 14 | Q | And what does that mean? |
| 15 | A | That means I would -- I would get my -- my full |
| 16 | | annuity. |
| 17 | Q | Without reduction for federal income taxes. |
| 18 | A | No, without reduction for retiring at a -- at an age -- |
| 19 | | early age under 53 or 52. |
| 20 | Q | How old were you when you retired? |
| 21 | A | 46. |
| 22 | Q | Okay. So you retired at 46. |
| 23 | A | Yeah. |
| 24 | Q | And you were led to believe by Ms. Esposito that you |
| 25 | | were not going to be penalized because of your age? |

1    A        Me and my witness, Mrs. Terry Ogino, who signed my

2             RIF -- the RIF paperwork.

3    Q        Right.

4    A        We were both misled.

5    Q        Okay.  Well, we'll get to Ms. Ogino later.....

6    A        Okay.

7    Q        .....because we don't know exactly what's in her mind.

8             I need to know what's in your mind.....

9    A        Right.  Okay.

10   Q        .....while you are sitting there.

11   A        Right, right.

12   Q        So this says basic annuity without reduction of

13            $24,568.59.

14   A        Right.  Ms. Esposito highlighted my copy.

15   Q        Okay.

16   A        And I would like to continue on it, if I may.  And then

17            I -- I proceeded to calculate it myself.  I was sitting

18            next to Terry Ogino to calculate what my monthly

19            earnings would be and what less taxes would be and if

20            this -- this was acceptable to me, this offer, so I'll

21            leave it at that.

22   Q        Okay.  Well, what was it that you came up with as

23            your.....

24   A        I came up that I was going to get about between 1,800

25            and $1,900 a month.....

1  Q    1,800 and $1,900 a month.

2  A    .....after taxes.

3  Q    After taxes.  Okay.  Because you thought at that time,

4       your tax rate was 18 percent?

5  A    18 percent and -- 18 percent of 24,000 divided by 12

6       would have been around eighteen, $1900 a month.

7  Q    Okay.  And how much do actually receive now?

8  A    About eight- -- between eighteen and $1,900 a month.

9  Q    After taxes?

10 A    No.  Before -- there were -- there were no taxes taken

11      out, so I wasn't suspect to anything being wrong.  I

12      said, oh, I was right on target, you know, this is what

13      I'm supposed to be earning.

14 Q    Well, this -- if we go on down this page.....

15 A    Yeah.

16 Q    .....there says final AAFES retirement annuity

17      income.....

18 A    Right.

19 Q    And it projects annuity prior to age 62, monthly,

20      $1,722; annual, $20,664.  Why is that different from

21      the basic annuity without reductions?

22 A    That's a penalty -- with the age penalty.

23 Q    Okay.  So the age penalty was disclosed to you on this

24      exhibit number 2, correct?

25 A    It was -- it was disclosed to me.  However, it didn't

| | | |
|---|---|---|
| 1 | | apply to me as per Ms. Esposito.  She said, I'm without |
| 2 | | reductions. |
| 3 | Q | All right.  Now, let's -- but see..... |
| 4 | A | Uh-huh. |
| 5 | Q | .....you're not answering my question.  We're going to |
| 6 | | get to the answer you want to give in just a minute. |
| 7 | A | Oh, okay. |
| 8 | Q | First, we have to go through my loops, okay? |
| 9 | A | No problem. |
| 10 | Q | All right.  It was disclosed to you that there -- what |
| 11 | | the monthly annuity would be with reduction for your |
| 12 | | then current age of 46, correct? |
| 13 | A | Not correct.  I -- it was exposed to me what the -- |
| 14 | | without reductions would be.  That's -- that's what we |
| 15 | | focused on. |
| 16 | Q | Well, I mean, I see that. |
| 17 | A | Uh-huh. |
| 18 | Q | I mean, that's highlighted on the piece of paper that |
| 19 | | you have in your notebook.  It says, this is what it's |
| 20 | | going to be without reductions, 24,568.59, right? |
| 21 | A | Yes, right. |
| 22 | Q | Okay.  And then down below that, it says, with |
| 23 | | reductions, the annual is $20,664, right? |
| 24 | A | That's what it says, but that was not discussed. |
| 25 | Q | You know, we're going to get through this faster..... |

*LIZ D'AMOUR & ASSOCIATES, INC.*
*330 Wendell Street, Suite A*
*Fairbanks, Alaska 99701*
*(907) 452-3678*

| | | |
|---|---|---|
| 1 | A | Okay. |
| 2 | Q | .....if you just answer the question..... |
| 3 | A | Uh-huh. |
| 4 | Q | .....and then you're going to be given a chance to say |
| 5 | | it again later.  Okay? |
| 6 | A | Okay.  Okay.  Fine. |
| 7 | Q | So it was disclosed what was -- what the annuity was? |
| 8 | A | Yes. |
| 9 | Q | Okay.  With reductions for your early age or -- right? |
| 10 | | But the important thing in your mind -- correct me if |
| 11 | | I'm wrong, the important thing in your mind is, |
| 12 | | Mrs. Esposito never said anything about this $20,664. |
| 13 | | She was talking to you only about the basic annuity |
| 14 | | without reductions, right? |
| 15 | A | Correct, correct. |
| 16 | Q | Okay.  And that's why you took the deal.  Is that |
| 17 | | correct? |
| 18 | A | Well, I took that deal based on that, correct, and I |
| 19 | | did consult my attorney, Mr. Richard Wright and..... |
| 20 | Q | Okay.  And Mr. Wright said this would be a good deal. |
| 21 | | You ought to take it. |
| 22 | A | This is a -- this is a good deal. |
| 23 | Q | And which number was he talking about when he said, |
| 24 | | this is a good deal? |
| 25 | A | Well, I took the -- this copy -- the same -- the same |

LIZ D'AMOUR & ASSOCIATES, INC.
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

1          form.

2    Q     Okay.  And -- but you only talked to him about the

3          $24,568.59 number, is that correct?

4    A     And the -- I showed him the RIF letter also.

5    Q     Right.

6    A     Right.  Where the -- you know, with my points, I don't

7          have a chance in my career anywhere.  I'm -- I'm ranked

8          against other employees.  My career is going nowhere.

9          They're offering me this and based on that, I accepted

10         the offer.

11   Q     Okay.  But did you accept the offer because you thought

12         you were going to get 24,000 a year or because you

13         thought you were going to get 20,000 a year?

14   A     Oh, 24,000, of course.

15   Q     Okay.  And when Mr. Wright advised you to accept this

16         deal, was he advising you based on the 24,000 a year or

17         the 20,000 a year?

18   A     24,000.

19   Q     Okay.  Now, this next page, exhibit number 5, what

20         actually is exhibit number 5?

21   A     It's a transaction record taking me from a -- my status

22         of active employment to a RIF status.

23   Q     But it doesn't have anything -- it doesn't show you an

24         amount or anything?

25   A     It shows my job pay, my annual rate, averaged -- my

| | | |
|---|---|---|
| 1 | | bases -- what they write their regulations based on. |
| 2 | Q | Okay. |
| 3 | A | There's a parallel there. |
| 4 | Q | So the exchange operating procedure is based upon these |
| 5 | | army regulations..... |
| 6 | A | Right.  Yeah. |
| 7 | Q | .....that we have here as exhibit number 8? |
| 8 | A | Very similar. |
| 9 | Q | Okay.  All right.  So in April -- March or April of |
| 10 | | 2002, you find out that you're not getting annuity of |
| 11 | | $24,000; you're getting an annuity of about $20,000. |
| 12 | A | Right. |
| 13 | Q | You start inquiring by phone and by e-mail.  And on |
| 14 | | October 10th, 2002 you get a letter, an e-mail that |
| 15 | | finally discloses to you that there is no RIF roster. |
| 16 | A | Right, right. |
| 17 | Q | Okay.  When did you file the lawsuit here that we're on |
| 18 | | here today, this complaint in exhibit number 1?  Do you |
| 19 | | remember? |
| 20 | A | Yeah.  It's -- it's dated.  It's right in front of us, |
| 21 | | April 12th, 2005. |
| 22 | Q | Okay.  Can you tell me why you didn't do anything from |
| 23 | | October 10th of 2000- -- wait.  Strike that.  Let me |
| 24 | | start over.  Can you tell me why you didn't file a |
| 25 | | lawsuit between October 10th of 2002 and April of 2005? |

```
 1  A    Yes.  Because my attorney that -- who was working with
 2       me on my EEO complaint that was unresolved.....
 3  Q    Uh-huh.
 4  A    .....wrote the exchange asking them what -- about the
 5       retirement, that it was legitimate and, you know, so
 6       the ca- -- it was active.  We were actively pursuing my
 7       retirement because it -- what -- it was a means of
 8       reprisal.  It was tied into my other lawsuit.  It -- it
 9       was on the heels of my other lawsuit we weren't
10       finished with.
11  Q    Okay.  So let's see if -- I want to make -- I don't
12       want to put words in your mouth.....
13  A    No.
14  Q    .....and I'm trying to understand.  Okay?
15  A    Right.  Exactly.
16  Q    Now, is it your contention that Ms. Esposito misled you
17       with respect to the amount of money you would receive
18       in your annuity as result of your filing the EEO
19       complaint?
20  A    I'd say not just that alone.  We had -- we had issues
21       about staffing policies that we discussed earlier in
22       this deposition, that she was very angry about a
23       congressional investigation that was conducted and --
24       and she was proven to be wrong about the staffing of my
25       facilities.
```

1  Q    So is it then your contention that Ms. Esposito misled

2         you about the amount of the annuity to get you out of

3         AAFES and kind of out of her hair?

4  A    Right.  I think it was a payback and there's no RIF

5         roster.  This -- the whole action was -- was not

6         legitimate and I think that she orchestrated the whole

7         thing and it was -- it was intentional.

8  Q    Okay.  Going back to exhibit number 1, the

9         complaint.....

10  A    Yes, sir.

11  Q    .....page 2, we're down here in paragraph C, statement

12         of facts, sub paragraph 2.

13  A    Yes, sir.

14  Q    You write that the plaintiff was informed that his

15         retention scores when compared against other managers

16         in similar positions justified the action.  In that

17         sentence, is that something that Ms. Esposito told you

18         during your meeting with her or is that something that

19         is written in the -- in that letter?

20  A    I was told in the meeting as per paragraph 4, on the

21         advanced reduction letter, you were identified to

22         proposed action based on your retention scores, which

23         is prepared and executed.  That RIF roster compared me

24         to other managers that I was in similar positions

25         and -- and in the similar grade with.

```
 1   Q      Okay.  What did Terry tell you that she did then?  Did
 2          she tell you that she talked to people about this?
 3   A      Yeah.  Terry -- oh, at first, she says -- I told Terry
 4          and she says, Richard, you'd better -- this -- she
 5          says, no -- no doubt about it, you're offered a penalty
 6          retirement.  You need to have this investigated.  So at
 7          that point, I contacted misses -- Mrs. Netter.  That's
 8          in the spring of 2002.  And I contacted her several
 9          times, via e-mail, telephone, and I finally got an
10          answer in October 2002.
11   Q      Okay.
12   A      And later on -- oh, miss -- you're asking about
13          Ms. Ogino.
14   Q      Right.
15   A      I -- well, I -- I mentioned my attorney got involved in
16          this and wrote AAFES and said there's something wrong
17          and to -- I told Terry he wants to take a deposition
18          from you and that Terry -- Terry got -- and told -- got
19          in touch with the defendant and who told a -- to set
20          the record straight, she told the truth to -- to.....
21   Q      Right.
22   A      .....to Mrs. Netter and then Mrs. Netter, in paragraph
23          5, told Terry not -- she cautioned not to give any
24          depositions or make any statements unless you have to
25          do so in a court of law.
```

```
 1  Q    .....the RIF roster, correct?

 2  A    Right.  Yes, sir.

 3  Q    And that the defendant's statement is false and you use

 4       the word fictitious, but it.....

 5  A    Fictitious, yeah.

 6  Q    .....it's a false statement in your book, right?

 7  A    It's -- okay.  Okay.  I -- play of words.

 8  Q    And then your -- the next is really your -- kind of the

 9       allegation that's central.....

10  A    Yeah.

11  Q    .....that you were singled out and then terminated from

12       employment on false pretenses.

13  A    Yes, sir.

14  Q    Okay.  And what are the false pretenses?

15  A    Well, there -- I was -- there was no RIF roster to even

16       justify the action.

17  Q    I'm not questioning you about that.

18  A    Oh.....

19  Q    I just -- what I'm trying to do is get your factual

20       underpinnings.

21  A    Right.

22  Q    I'm -- and so please don't get upset with me.

23  A    No, no, no.  I'm not upset.  I'm just excitable.

24  Q    Okay.  So there's no RIF roster.....

25  A    No, no.  No RIF roster.
```

*LIZ D'AMOUR & ASSOCIATES, INC.*
330 Wendell Street, Suite A
Fairbanks, Alaska 99701
(907) 452-3678

```
 1        how much you want, too.
 2  A     Yeah.  I ju- -- I want justice is what I want
 3        primarily.
 4  Q     Okay.  You know, justice always has a price and that's
 5        what I'm trying to get you to tell me.
 6  A     Yeah.
 7  Q     What do you think it's worth?  How much have you
 8        spent.....
 9  A     Oh, man.  I've sold my house, my boat, my land; living
10        in a log cabin now; my whole livelihood; my gun
11        collection, my antiques.  I've sold everything.  I --
12        my standard of living just was cut in -- cut by two-
13        thirds.  I'd like to give it some thought.
14  Q     Okay.
15  A     More thought and may I do that?
16  Q     Sure.
17  A     Yeah.  I just.....
18  Q     Okay.  Now, after the -- change topics for -- on you.
19        I want to go back to, you know, October of 2002.  You
20        found out that there was no RIF roster and that's when
21        you first formally knew.....
22  A     Right.
23  Q     .....you know, from AAFES, from an official that there
24        was no RIF roster.
25  A     Right.
```

1  Q   Were -- was Mr. Wright still your attorney at that
2      time?
3  A   Right, right.  Mr. Wright was my attorney.
4  Q   Did you receive any advice from Mr. Wright about filing
5      this lawsuit, the one we're talking about right now?
6  A   Well -- right.  We -- because we had a lawsuit that was
7      not resolved and Mr. Wright was still my attorney, this
8      related to the lawsuit that was ongoing.  This was
9      reprisal.  This is his -- so he says, we can address
10     this un- -- under the -- the label of a lawsuit rung.
11     This is just a -- another, you know, active reprisal
12     against you in the midst of what's going on.  So he
13     wrote and said, hey, where's this roster at, you know,
14     and.....
15 Q   And that was in Reznak versus Cohen, right?
16 A   Yeah, right, right, right.
17 Q   And that's case number.....
18 A   Right.
19 Q   F00.....
20 A   Right.
21 Q   .....041-cv-HRH, right?
22 A   Right.
23 Q   And so he -- Mr. Wright told you that you could address
24     your.....
25 A   Yeah.

1   Q    .....early retirement claims in the -- in that lawsuit?

2   A    Yeah.  He -- what we discussed and he even says -- you

3        know, he said to me, Mr. Reznak -- he says, this merits

4        almost its own damn lawsuit, just this action alone.

5        However, let's see what they -- what -- what they

6        respond to this now.  I mean, what's the -- what's

7        going on here?  This is just another active reprisal so

8        we thought we -- it was in our favor to just expose it.

9   Q    Did you ever file any kind of an administrative claim

10       with AAFES or the merit, the pay board, or civil

11       service of any kind.....

12  A    About this incident?

13  Q    About the claim that you have right here in exhibit

14       number 1, the complaint and.....

15  A    No.  I called the -- I called the EEOC about the same

16       time when I was talking to Mrs. Netter trying to get

17       the RIF roster.  And EEOC -- C told me, Mr. Reznak,

18       since you've exceeded one year or something, the 360

19       days or whatever it was, you would have to -- you would

20       have to seek this through the court system -- your

21       complaint through the court systems, because I didn't

22       qualify for that -- that avenue to go and -- and I -- I

23       didn't know that during the year that I retired, I --

24       if I had known, I'd have -- I'd have challenged it, but

25       it was too late, but not too late -- two years, I

|   |   |   |
|---|---|---|
| 1 |   | think, was the statute for going to court, so I -- |
| 2 |   | Richard got involved, so we were within the statute of |
| 3 |   | two years either way or whatever it was. |
| 4 | Q | So, once again, I don't want to misstate your..... |
| 5 | A | Uh-huh. |
| 6 | Q | .....your testimony. |
| 7 | A | Right. |
| 8 | Q | So is it true to say that originally you thought your |
| 9 |   | claim dealing with the RIF roster was encompassed in or |
| 10 |   | part of or related to your earlier lawsuit that you |
| 11 |   | brought in 2000? |
| 12 | A | What do you mean by encompassed in? |
| 13 | Q | Well, I'm -- yeah.  See that's why I don't want to try |
| 14 |   | and..... |
| 15 | A | Unh-unh. |
| 16 | Q | .....put words in your mouth.  I'm -- did you think |
| 17 |   | originally that the actions of Ms. Esposito in April of |
| 18 |   | 2001, when you contend she lied to you..... |
| 19 | A | Right. |
| 20 | Q | Is that part of your earlier lawsuit against Secretary |
| 21 |   | Cohen? |
| 22 | A | No.  That's part of her own motivation, is reprisal |
| 23 |   | against me for the congressional and other things that |
| 24 |   | went on, I think. |
| 25 | Q | But the congressional wasn't your congressional, was |

1  Q    Judge Beistline, yes.

2  A    Judge Beistline.  I'd like him to consider that the --

3       the facts that -- number 1, I was un- -- unlawfully

4       terminated from employment on -- under false pretenses.

5       I want him to take a close look at that.  And that I

6       exhausted all my administrative remedies and -- prior

7       to filing my lawsuit and -- and I think I've done

8       everything I -- I lawfully had to do.  Number 3,

9       AAFES -- the AAFES system with regards to my case, did

10      not follow employment policy or due process and that --

11      they need to take a look at that.  It's serious -- it's

12      a serious matter.  Number 4, I think as a solution

13      to -- to my lawsuit, I'm -- I would be willing to

14      settle up given this little thought and I would be

15      willing to settle for back pay and allowances to date

16      and to be retired and in a proper and honorable

17      fashion, other than the way I was retired. And

18      number 5, if -- if AAFES isn't willing to -- to -- to

19      negotiate or settle with me, I would like my case to be

20      taken to trial and I'd like a jury to hear -- hear my

21      complaint.

22  Q    Hear your story.  Okay.

23  A    Hear my story.  That's basically what I have to say.

24  Q    Let's go back to number 3, again for a minute.

25  A    Yes, sir.

**ERRATA SHEET FOR THE TRANSCRIPT OF :**

| | |
|---|---|
| **Case Name :** | **Richard F. Reznak v. Donald Rumsfeld** |
| **Case Number :** | **4:05 - cv - 7- RRB** |
| **Dep. Date :** | **February 16, 2006** |
| **Deponent :** | **Richard F. Reznak** |

### CORRECTIONS :

**Note to Honorable Judge Beistline : My deposition was taken 3 days after being released from the Fairbanks Memorial Hospital for surgery on a double hernia in my stomach area. I apologize for the text being a bit clumsy. I was on pain medication and the duration and repetition of questions caused high anxiety and much discomfort . I did my best and now I wish to clarify several items that I could not at that time.**

**Pg.    Ln.    Correction / Explanation**

**7    4    The question was misleading . I thought Mr. Cooper meant filing a lawsuit on my own without a lawyer so I answered No. After reviewing the deposition I would have to answer Yes. I filed two lawsuits against AAFES mentioned in my deposition. In addition, I filed a lawsuit in Alaska Small Claims Court involving a bad Real Estate transaction on the sale of my home which I won .**

**28    15    I would like to clarify sentence 15 through 24. Mrs. Lois**
**24    Esposito / House assisted Mrs. Mary Ellen Miles my EEO Complaint Investigator . Esposito distracted and coached Mrs. Mary Ellen Miles who failed to interview key witness and made false assertions in her report . These errors all were brought to Mrs. Miles attention and she did nothing. Mrs. Miles also failed to conduct an exit interview with me as required prior to concluding her investigation. I hired a private attorney and spent several thousand dollars and years trying to correct this travesty of justice.**

- 1 -

| pg. | Ln. | |
|-----|-----|---|
| 28 | 15 24 | **Continued : Mrs . Esposito / House is one of the main reasons I filed lawsuits and complaints. I would like to reference Exhibit 10 of this deposition . It displays the ill will and malice that Mrs. Esposito / House harbored against me in a letter that she wrote to me. The letter was protested to AAFES and nothing was done. The United States Attorney Mr. Cooper was provided my complete career record which contains many other incidents which will be made public in trial. I clearly will demonstrate and site examples of how AAFES committed repeated instances of perjury. I will also expose how AAFES fraudulently maintained immunity and exemption from due process and the rule of law.** |

**69     5     Add : Penalty Free**

**86     1     Add : Substitute " any" for misspelt word " nay.**

**98     5     Add : Cooperation**

**102     20 After an extensive review of my deposition I find that the method of questioning tends to be confusing, difficult and strenuous to read and comprehend . I believe that AAFES did not prepare their attorney very well. Many questions were asked repeatedly because AAFES deliberately wants to maintain a line of deception between everybody. I have attached my discovery requests to this letter because I wish respectfully to request supervision and oversight by the presiding judge over my case .**

**Sincerely,**

**- 2 -**

**Richard F. Reznak**